## CIRCUIT COURT OF BALTIMORE CITY.

Filed December 17, 1906.

MAYOR AND CITY COUNCIL OF BALTIMORE
VS.
W. LEWIS ROWE ET AL.

*W. Cabell Bruce* and *J. S. Goldsmith* for plaintiff.

*George Whitelock* and *W. Thomas Kemp* for defendants.

NILES, J.—

In 1818 the Mayor and City Council of Baltimore acquired in fee simple the bed of Liffy Street (now West Falls Avenue). This street then bordered upon the Falls, was described as "bounding on and with the water of said Falls and extending therefrom westwardly for breadth forty feet," and ran southwardly "to the water of the Basin."

By the same deed the Mayor and City Council of Baltimore was granted "the exclusive right to charge and receive any wharfage, tonnage or other duties on said street," and a letter attached to the deed shows that it was the understanding that "the corporation might, if they should deem it advisable, widen the said street or any part thereof by extending the same on the east side into the Falls."

Between 1818 and 1856, by accretions and artificial improvements, there had been formed considerable land to the east of Liffy Street and at the south end thereof. Out of such accretions the bed of what is now known as Block Street to the present drawbridge was formed, but the rest of the land so formed by accretion, etc., was not used either as street or wharf, but, in or about the said year of 1856, it was subdivided into ten lots and leased to various persons.

The most northerly lot, triangular in shape, with its apex toward the north, was leased to predecessors in title of the defendants in this case, and to certain other of such predecessors in title was conveyed the ground rent reserved by the above-mentioned lease, and now the defendants have a conceded title to that portion of the land so made, designated on the plat filed with the agreed statement of facts as Exhibit No. 1 by the letters B, C, D, E, and marked with the number 631.

This lot is composed in part of land made between 1818 and 1856, and in part of land so made since 1856. At present it is 54 feet 6 inches wide at its northern boundary, and 73 feet 1½ inches in its southern boundary, and has a frontage of 44 feet 7 inches on West Falls Avenue, but it is only to a small wedge of this on the western side coming to a point at the northern end that the defendants have paper title under the lease before alluded to, the balance being that which they or their predecessors obtained by accretion only. But their present fee-simple title in all this lot is undisputed, or was so when it was taken by the city for dock improvements and the money allowed therefor paid to them.

When this lot, which we will hereafter call "Lot 631," was being extended to the east there was being formed by the very same process a triangle of land to the north much resembling in shape the southerly lot as it was when conveyed in 1856. This northerly triangle was formed in part by accretions and in part by the filling in incident to the erection of the improvement known as the "Jones Falls Retaining Wall."

In 1904 this, which we will hereafter call "Lot No. 630A," had a frontage of 174 feet 2 inches on the West Falls Avenue, a base line of 54 feet 6 inches,

running to the retaining wall of the Falls, and a frontage on that retaining wall of 176 feet 6 inches to the beginning. It was also taken by the city for dock improvements, but title to it was claimed by both the city and the defendants in this case.

The damages allowed were paid into this court, an agreed statement of facts was filed in this case, and it was agreed that the fund should be distributed according to the rights of the parties.

The question now before the court is: "Who was the owner of Lot 630A at the time of its condemnation a few months ago?" The main claim of the defendants is that they had title to the whole of Lot 630A by adverse possession. They also make claim that even should they have no such title there was error in apportioning the made land between Lot 631 and Lot 630A.

To sustain this latter claim they invoke, as governing this case, the rule that where there has been a change of shore line by the recession of the waters of a navigable stream, the new land is to be divided between the adjacent riparian owners extending the lines from the corners of their lots as they bounded on the original shore line, at right angles to the present current of the stream.

The defendants claim that if the lines were so run instead of in the manner actually adopted by the city, they would be entitled to about 400 additional square feet of land.

In the view of the court upon the whole question, this claim becomes unimportant, and may, therefore, be disposed of here in a few words. The court does not understand the above to be the general rule, but only a subsidiary rule, adopted in some cases to give effect to the general rule, which is, that where there has been a change of shore line by reason of the recession of the waters of a navigable stream, the new shore line will be divided so that, as far as possible, the relative holdings of each of the riparian owners shall be the same upon the new shore line as they were upon the old.

By the method of running the lines adopted by the city this object is almost exactly accomplished; and it is moreover, the method adopted by the owners of Lot 631 and the lot immediately south of it in the conventional

division between them of the "made" ground adjoining their holdings.

On the other hand the method of running the lines contended for by the defendants would produce considerable inequality in the relative lengths of the old and the new shore lines, as between Lot 631 and 630A.

For these reasons, were a decision necessary, the lines as run by the city would be held correct.

To the main contention of the defendants that they have acquired Lot 630A by adversary possession, the city makes two replies.

First. That the land so formed is simply an extension of a street or wharf; and, as against this public use, no title can be acquired by adverse possession, no matter what its character, or how long continued.

Second. Assuming that title might be so acquired, the facts contained in the "Agreed Statement" are not sufficient to prove it.

First. It seems to be law in this State, that where land is dedicated to a public use, like a street, no private person can by adverse possession acquire ownership thereof; although by disuser, abandonment and other acts and omissions, the public may equitably estop itself from asserting its rights.

But in this case this court holds that these accretions never formed a street or a wharf, either in whole or in part.

It is true that the city, by its deed of 1818, had the "right" to widen the street "by extending the same eastward into the Falls," and probably exercised this right in forming Block Street. But it never exercised this right as to the "made land" to the north of Block Street. On the contrary, in 1856, by the leases referred to, it treated all the "made land" north of Block Street as subject to no public use whatever, and conveyed it to private parties.

It would seem unreasonable to hold, in the face of this action—finally settling the width of West Falls Avenue and indicating that the city considered these accretions simply as land subject to no public use, and to be disposed of to the best advantage—that land subsequently made, in precisely similar manner and similarily situated, should be held a public street or wharf, although as matter of fact it was never used as either, and there is no proof in

the agreed statement of facts that it could be so used.

It seems to the court plain that this "made" land, now in dispute, was held by the city—as was the other "made" land to the south thereof—practically in the capacity of private owner, in regard to which there is no good reason why the title might now be aliened, lost by adverse possession, or affected by prescription.

For the same reason Section 7 of the City Charter, cited by the plaintiff, which provides that: "The title of the Mayor and City Council of Baltimore in and to its water front wharf property, land under water, public landings, wharves, docks, highways, avenues, streets, lanes, alleys and parks is hereby declared to be inalienable" taken in connection with Section 13: "Nothing contained in this article shall prevent the city from disposing of any building or parcel of land no longer needed for any public use" is inapplicable here.

Even assuming that real estate, which is "inalienable," cannot be lost by adverse possession, it seems clear (a) that the "water front" intended is what was at the time of the passage of the law, water front in the possession of the city; (b) that when land acquired by the city by accretion and improvement has never been subjected to public use, is not now needed for such use, and never could be put to such use without great expense and inconvenience, nothing contained in Section 7 would be relevant to such property. Situated as this property was, it seems clear that had the city owned it without dispute, it might have sold it as not needed for public use.

A fortiori, adversary possession if duly proven would give title as against the city.

Second. Are the facts of this case sufficient to establish adverse possession?

On the southern part of Lot 630A the defendants and their predecessors in title built a frame stable prior to 1882. This frame stable they maintained until a brick stable of practically the same size was substituted in its place, and for more than twenty years they maintained a stable, either brick or frame upon this lot.

The other part of the lot the defendant and their predecessors in title

used to store sails, boats, anchors, dredges, chains, lumber, etc., for more than twenty years.

Up to 1896 no taxes were paid on any part of Lot 630A. In that year Prendergast, one of the predecessors of the defendants in title, made return of his real property under the New Assessment law. He returns "One (1) double brick building, 45 feet square," valued at "3,500," and "one (1) horse stable, 25 feet square," valued at "250," "known as 651 and 653 West Falls Avenue. Stable known as 649 West Falls Avenue."

To this return he annexes the required oath that the foregoing schedule "contains a full and complete list of all real property owned by me in the State of Maryland," etc., and affixes his signature.

Upon that return the city officials made the following assessments:

Lot No. 10 (on Exhibit No. 5) assessed to Patrick F. Prendergast, lot forty-four feet and six inches by about seventy-three feet at the south end at irregular, at $45.00 ..............................$2,003.00

Improvements, three-story brick dwelling and store (double house) ........................... 2,200.00

Lot No. 11, P. F. Prendergast; lot twenty-one feet and three inches by forty-four feet and four inches at the north end, irregular, at $45.00 ......................... 956.10

Improvements, stable............. 250.00

Lot No. 12, "City Lot," a triangular lot one hundred and thirty-nine feet on west Falls Avenue, forty-four feet and four inches deep on southern line to a point on the northern line. No assessment .................................. .......

Lot No. 10 is of course Lot 631 as to the title of which there is no dispute.

Lot No. 11 is the lot upon which there has actually existed a stable for at least fourteen years prior to the assessment; the ground between the stable and the water evidently being considered by the city officials as merely the curtilage appurtenant to the stable.

Upon that lot the predecessors of the defendants in title paid the taxes for six years after the assessment or to and including 1902.

It would seem hard to imagine better evidence of adverse possession of a lot as against any one than the building of a stable over it and maintaining that stable there continuously for more than twenty years; and as against the city it would seem as if the lines of

the lot marked out by its own officials as appurtenent to the stable, and then assessed by its officials according to the square feet in the lot so marked out, ought to conclusively settle as against it, especially after the claimant has paid taxes upon this assessment for six successive years.

This court will hold that the title of the defendants by adversary possession to this lot fronting 21 feet and 3 inches on West Falls Avenue, and running with an even width to the Falls and marked "11" on Exhibit No. 5 is sustained.

On the other hand it is hard to conceive how it can be said that the predecessor of the defendants in title held open and notorious and continuous possession as against the city, which was the real owner, of a lot which by his return under oath was practically disclaimed by him, which was marked upon the tax books as "City Lot" "No assessment," and upon which, as matter of fact, not one cent of tax ever was paid.

As against this disclaimer the fact that the defendants or their predecessors in title used this vacant "City Lot" upon which to store articles of various kinds will not be held of such weight.

The court will hold that as to the lot marked "12" on Exhibit No. 5, the defendants have not shown a good title by adversary possession.

The fund in court will be divided in accordance with this opinion.